IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

WILLIAM DEJOLIE and
SAMMIA DEJOLIE,
on their own behalf and
on behalf of all others similarly situated

      Plaintiffs,

v.

T&R MARKET, INC.,
TANCORDE FINANCE, INC., and
T&R TAX SERVICE, INC.,

      Defendants.

## CLASS ACTION COMPLAINT FOR DAMAGES

1. Every year, Defendants make thousands of high-cost tax refund anticipation loans to people living on and around the Navajo Nation in northwest New Mexico.

2. "Refund anticipation loans (RALs) are loans secured by and repaid directly from the proceeds of a consumer's tax refund from the Internal Revenue Service (IRS) . . . RALs drain hundreds of millions of dollars from the pockets of consumers and the U.S. Treasury. They target the working poor, especially those who receive the Earned Income Tax Credit (EITC), a refundable credit intended to boost low-wage workers out of poverty."[1]

3. Defendants compounded the inherently predatory nature of tax refund anticipation loans by engaging in widespread and intentional deception of their customers.

4. In each of Defendants' tax refund anticipation loans since November of 2014,

---

[1] http://www.nclc.org/images/pdf/high_cost_small_loans/report-ral-2010.pdf

Defendants uniformly under-disclosed the Finance Charge and Annual Percentage Rate, deceiving their customers and giving themselves an unfair competitive advantage.

5. In addition, Defendants unlawfully collected fees from customers' tax refunds in excess of what was permitted by contract.

6. Defendants knew that they were breaking the law because they recently were sued for nearly identical misconduct. *Chester v. Tancorde Finance, Inc*., No. 1:14-cv-00092-LAM-GBW (D.N.M., filed February 1, 2014).

7. Plaintiffs assert causes of action for Defendants' violations of the federal Truth in Lending Act, 15 U.S.C. §§ 1601 *et seq*. ("TILA"), the New Mexico Unfair Practices Act N.M.S.A 1978 §§ 57-12-1 *et seq*. ("UPA"), and for conversion, willful breach of contract, unjust enrichment, and civil conspiracy.

8. Plaintiffs seek remedies for themselves and the many other consumers who were injured by Defendants' deceptive practices.

## Jurisdiction

9. This Court has jurisdiction under the TILA, 15 U.S.C. §1640(e), and pursuant to 28 U.S.C. §§1331 and 1337. The Court has supplemental jurisdiction over state law claims under 28 U.S.C. §1367.

10. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) because Defendant is located in this district and a substantial portion of the events giving rise to this complaint occurred within the district.

## Parties

11. Plaintiffs William DeJolie and Sammia DeJolie, a husband and wife, are residents of

Crownpoint, New Mexico. They are members of the Navajo Nation. They are "consumers" as defined by the TILA, 15 U.S.C. §1602(i) and Regulation Z, 12 C.F.R. §1026.2(a)(11).

12. Defendant T&R Market, Inc. ("T&R Market") is a New Mexico corporation with its principal place of business in Gallup, New Mexico. It is a "creditor," as defined in the TILA, 15 U.S.C. §1602(g), and Regulation Z, 12 C.F.R §1026.2(a)(17). The transactions described herein were made in the regular course of T&R Market's trade or commerce.

13. T&R Market operates a complex of retail stores on Highway 491 on the north end of Gallup, New Mexico, including a grocery store, gas station, western wear store, and feed and ranch supply store.

14. T&R Market also has a pawn and jewelry businesses at the Highway 491 complex and inside Gallup's Rio West Mall.

15. T&R Market is the parent company of Defendants Tancorde Finance, Inc., and T&R Tax Service, Inc., all of which are part of a joint enterprise for the purpose of making tax refund anticipation loans.

16. Defendants agreed to share their money, property, employees, and time in pursuit of their tax refund anticipation loan business. They share the profits and losses of the business and they are subject to mutual control over the business.

17. Defendant Tancorde Finance, Inc. ("Tancorde") is a New Mexico corporation with its principal place of business in Gallup, New Mexico. It is a "creditor," as defined in the TILA, 15 U.S.C. §1602(g), and Regulation Z, 12 C.F.R §1026.2(a)(17). The transactions described herein were made in the regular course of Tancorde's trade or

commerce.

18. Tancorde has no physical location or employees, but it is identified as the creditor in all tax refund anticipation loans made by Defendants.

19. Defendant T&R Tax Service, Inc. ("T&R Tax Service") is a New Mexico corporation with its principal place of business in Gallup, New Mexico. It is a "creditor," as defined in the TILA, 15 U.S.C. §1602(g), and Regulation Z, 12 C.F.R §1026.2(a)(17). The transactions described herein were made in the regular course of T&R Tax Service's trade or commerce.

20. T&R Tax Service has offices at T&R Market's Highway 491 complex, in Gallup's Rio West Mall, and in Farmington, New Mexico, Shiprock, New Mexico, and Chinle, Arizona.

### The Truth in Lending Act

21. For nearly fifty years, the TILA has required "meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him." 15 U.S.C. §1601.

22. Central to the TILA is the requirement that the creditor disclose the "Finance Charge" of the loan, consisting of "all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. §1605(a).

23. Charges that do not qualify as Finance Charges are disclosed as the "Amount Financed." 15 U.S.C. §1602(a)(2)(A).

24. The creditor must use the disclosed Finance Charge to calculate the "Annual Percentage Rate" ("APR") of the loan. 15 U.S.C. § 1606.

4

25. The uniform disclosure of the Finance Charge and APR allow the consumer to make informed decisions about the cost of credit, and prevent the creditor from gaining an unfair competitive advantage by misleading the consumer.

26. Compliance with the TILA is simple. The Consumer Financial Protection Bureau provides forms that comply with the TILA. *See, e.g.* 12 C.F.R. §1026, Appendix H.[2] The Office of Comptroller of the Currency offers a free online APR calculator.[3]

## Defendants Make Predatory Tax Refund Anticipation Loans

27. Defendants make thousands of tax refund anticipation loans each year.

28. Defendants make tax refund anticipation loans from all of their locations: the Highway 491 complex, the Rio West Mall, and from the offices in Farmington, New Mexico, Shiprock, New Mexico, and Chinle, Arizona.

29. All of Defendants' tax refund anticipation loans are consumer credit transactions within the meaning of TILA, 15 U.S.C. §1602(f), (i), and Regulation Z, 12 C.F.R. §1026.2(a)(12), (14).

30. Every tax year, Defendants offer two kinds of tax refund anticipation loans.

31. First, Defendants offer what they call "Holiday Instant Cash Loans" ("Holiday Loans") to customers in November and December, before tax season.

32. The process for receiving a Holiday Loan from Defendants' Rio West Mall location illustrates the manner in which Defendants work in concert to make tax refund anticipation loans.

33. Defendants share space in the Rio West Mall, part of which is used for a T&R Tax

---

[2] https://www.consumerfinance.gov/eregulations/1026-H/2016-14782_20160627#1026-H

[3] https://www.occ.treas.gov/tools-forms/tools/compliance-bsa/aprwin-software.html

Service office, and part of which is a separate T&R Market pawn and jewelry store.

34. To receive a Holiday Loan, the customer first visits the T&R Tax Service office.

35. At the T&R Tax Service office, a T&R Market employee prepares a loan application with the customer and collects supporting documents.

36. The loan application is provided to a T&R Tax Service employee.

37. Because W-2s have not yet been issued at the time a Holiday Loan is offered, the tax return cannot yet be prepared and T&R Tax Service must estimate the refund.

38. If the customer is determined to be eligible for a Holiday Loan based on the estimated refund, the customer proceeds to T&R Market's pawn and jewelry store to sign a contract and receive the loan proceeds.

39. The contract identifies Tancorde as the creditor.

40. The contract states that the customer is obligated to repay the loan proceeds plus a Finance Charge.

41. Defendants charge predatory APRs in their Holiday Loans, and as set forth below, the true APR is considerably higher than the disclosed APR.

42. As part of receiving a Holiday Loan, the customer agrees to return to T&R Tax Service once W-2s have been received, so that T&R Tax Service can prepare the customer's tax return and arrange for the Holiday Loan to be repaid from the tax refund.

43. Beginning in January, when the customer returns with W-2s, T&R Tax Service prepares the tax return for a fee.

44. T&R Tax Service defers payment of the tax preparation fee until the refund is received.

45. Once T&R Tax Service prepares the customer's tax return, Defendants offer the second type of tax refund anticipation loan, called an "Instant Cash Loan" ("Refund Loan").

46. Refund Loans are similar to Holiday Loans, except that credit is extended based on the refund claimed in the actual tax return, instead of an estimate of the expected tax refund.

47. Like the Holiday Loans, although Tancorde is identified as the creditor, Defendants act in concert to make Refund Loans to their customers.

48. Like the Holiday Loans, Refund Loans have predatory APRs.

49. In both kinds of tax refund anticipation loans, T&R Tax Service arranges for the customer's refund to be deposited in a bank account belonging to T&R Market.

50. When T&R Market receives the refund, it pays off all loans from Tancorde and the tax preparation fee from T&R Tax Service. Then it refunds the remainder to the customer.

51. In all of its tax refund anticipation loans to thousands of customers, including Plaintiffs, Defendants imposed hidden charges, deceptively understated the APR, and engaged in other unlawful and deceptive conduct.

**Defendants Made a Deceptive Holiday Loan to Mr. and Mrs. DeJolie**

52. In November of 2016, Mr. and Mrs. DeJolie needed money to travel and buy food for Thanksgiving, and to pay other bills.

53. Mr. and Mrs. DeJolie were aware that various Gallup lenders offered tax refund anticipation loans, so they decided to apply for one.

54. Mr. and Mrs. DeJolie went to T&R Tax Service in the Rio West Mall.

55. Employees asked Mr. and Mrs. DeJolie for documents and information in order to estimate their 2016 tax refund.

56. After reviewing this information, employees told Mr. and Mrs. Dejolie that their estimated refund was more than $8,000.

57. On this basis, Defendants approved a Holiday Loan of $1,250.

58. Mr. and Mrs. Dejolie went to the pawn and jewelry store and signed a document entitled "Holiday Instant Cash Loan Agreement & Truth in Lending Disclosures Statement" ("the Contract").  A copy of the Contract is attached to this Complaint as Exhibit 1.

59. Defendants used an identical or substantially similar form contract in all of its Holiday Loans starting in November of 2014.

60. The Contract stated that Mr. and Mrs. DeJolie were required to make two payments of $762.50, the first on November 23, 2016 and the second two weeks later, for a "Total of Payments" of $1,525.

61. The Total of Payments consisted of the return of principal of $1,250, plus a $250 "Finance Charge," plus a $25 "Document Fee."

62. The Document Fee was a charge imposed as an incident to the extension of credit, and as such, it was a Finance Charge under the TILA.  15 U.S.C. §1605(a).

63. However, in violation of the TILA, Defendants disclosed the Document Fee as part of the Amount Financed, not the Finance Charge.

64. The effect of misallocating the Document Fee as an Amount Financed instead of a Finance Charge was to make the loan appear cheaper than it really was by depressing the "Annual Percentage Rate" ("APR").

8

65. Defendants incorrectly disclosed the Document Fee as an Amount Financed in all of their Holiday Loans and Tax Refund Loans since November of 2014.

66. The Contract stated that the APR was a shocking 264%.

67. However, the true APR was much higher.

68. Even disregarding the misrepresentation of the Document Fee as an Amount Financed, the APR on the loan should have been disclosed at about 333%.

69. If the Document Fee had been properly identified as a Finance Charge, the APR would have been 373%.

70. Including the hidden charges that Mr. and Mrs. DeJolie later discovered, **the true APR was an unconscionable 385%!**

71. In short, Defendants grossly understated the APR in the Contract. For reference, the TILA has a tolerance for inaccuracies less than 1/8 of 1%. 15 U.S.C. §1606(c). Defendants' misstatement of the APR was almost 1,000 times the tolerance for error allowed by the TILA.

72. Defendants understated the APR by more than 1/8 of 1% in all of its Holiday Loans and Refund Loans since November of 2014.

73. Mr. and Mrs. DeJolie were unaware of Defendants' deception.

74. Defendants gave Mr. and Mrs. DeJolie the Holiday Loan proceeds, and Mr. and Mrs. DeJolie agreed to return once they received their W-2s.

75. True to their word, Mr. and Mrs. DeJolie returned to the T&R Tax Service office in the Rio West Mall on March 17, 2017, to prepare their tax return.

76. T&R Tax Service prepared their tax return, for which Mr. and Mrs. DeJolie agreed to pay a tax preparation fee of $145. A copy of the invoice is attached to this Complaint

as Exhibit 2.

77. Defendants told Mr. and Mrs. DeJolie that it would later withdraw $145 from their tax refund to pay this fee.

78. T&R Market received Mr. and Mrs. DeJolie's federal tax refund a few days later.

79. On April 5, 2017, Mr. and Mrs. DeJolie went T&R Market's Highway 491 pawn location to receive their refund.

80. Defendants provided Mr. and Mrs. DeJolie with a "Closeout Sheet" stating that Defendants owed Mr. and Mrs. Dejolie $840.20 after the deduction of various amounts from the refund. A copy of the Closeout Sheet is attached to this Complaint as Exhibit 3.

81. The deductions included the $1,525 Total of Payments from the Contract.

82. The deductions also included the tax preparation fee, but instead of $145, Defendants took $157.05.

83. Defendants had no contractual right to collect more than $145 for the tax preparation fee.

84. In all of its Holiday Loans and Refund Loans since November of 2014, Defendants collected more than the agreed-upon tax preparation fee.

85. The deductions also disclosed a "Credit Check Fee" of $9.75.

86. Defendants did not previously disclose the Credit Check Fee, and they had no right under contract to collect it.

87. The Credit Check Fee was a charge imposed as an incident to the extension of credit, and as such, it was a Finance Charge under the TILA. 15 U.S.C. §1605(a).

88. In all of their Holiday Loans and Refund Loans since November of 2014, Defendants

secretly charged a Credit Check Fee, and failed to include it in the disclosed Finance Charge on the face of its loan contracts.

89. Mr. and Mrs. DeJolie were injured by Defendants' misconduct, including by being deceived into entering into a loan that had a higher Finance Charge and APR than the disclosed amounts, by being forced to pay a tax preparation fee greater than that for which they contracted, and by being forced to pay an undisclosed Credit Check Fee.

### Mr. and Mrs. DeJolie Bring this Case as a Class Action

90. Plaintiffs are the representatives of a class of all persons who entered into tax refund anticipation loans with Defendants starting November 1, 2014.

91. The class is so numerous that joinder of all members is impracticable. Plaintiffs believe the number of members of the class exceeds 1,000 persons.

92. This action is based on standard practices of Defendants, who entered into loans using the same form contracts, uniformly under-disclosed the Finance Charge and APR, uniformly charged more than the agreed upon tax preparation fee, and uniformly charged a secret Credit Check Fee.

93. The issues involve questions of law or fact common to the class, which Plaintiffs have recited in detail throughout this Complaint. These questions predominate over any questions affecting only individual class members. The common questions include:

    a. Whether Defendants' standard loan contract disclosures violated the TILA;

    b. Whether Defendants' deceptive conduct violated the UPA;

    c. Whether Defendants' conduct constituted conversion;

    d. Whether Defendants' conduct constituted willful breach of contract; and

  e. Whether Defendants' conduct constituted unjust enrichment.

94. Plaintiffs' claims are typical of those of the class members. All claims are based on the same factual and legal theories. All claims arise from the same form documents and uniform business practices.

95. Plaintiffs will fairly and adequately represent the class. Plaintiffs are committed to litigating this matter. They have retained counsel experienced in handling class claims and claims involving unlawful business practices. Neither Plaintiffs nor class counsel have any interests which might cause them not to pursue this claim vigorously.

96. A class action is superior for the fair and efficient adjudication of the class members' claims. Class members are unaware of the fact that their rights have been violated. Defendants' customers cannot generally afford counsel to engage in individual litigation against Defendants. A failure of justice will result in the absence of a class action.

## First Claim for Relief:  Violations of the TILA

97. The tax refund anticipation loan made by Defendants to Mr. and Mrs. DeJolie, and every other tax refund anticipation loan to class members within the one year statute of limitations, violated the TILA in one or more of the ways set forth above.

98. Defendants are each directly liable under the TILA, are liable for aiding and abetting and participating in violations of the TILA, and are liable as members of a joint enterprise making loans that violated the TILA.

99. Plaintiffs and the class are entitled to statutory damages plus costs and reasonable attorney fees, as provided in 15 U.S.C. §1640.

## Second Claim for Relief: Violations of the Unfair Practices Act

100. The tax refund anticipation loan made by Defendants to Mr. and Mrs. DeJolie, and every other tax refund anticipation loan to class members starting on November 1, 2014, violated the UPA in one or more of the ways set forth above.

101. Defendants are each directly liable under the UPA, are liable for aiding and abetting and participating in violations of the UPA, and are liable as members of a joint enterprise making loans that violated the UPA.

102. Defendants willfully engaged in the illegal conduct alleged.

103. Class members sustained damages as a result of Defendants' violations of the UPA.

104. Plaintiffs and each member of the class are entitled to actual damages plus costs and attorney fees. N.M.S.A. 1978, §57-12-10.

105. In addition, Plaintiffs and each member of the class are entitled to injunctive relief, barring Defendants from collecting amounts above the Finance Charge and APR represented or fees in excess of the amounts permitted by contract, and requiring Defendants to correct any inaccurate credit reporting resulting from their violations of the law.

## Third Claim for Relief: Conversion

106. When Defendants collected money from the tax refunds of Mr. and Mrs. DeJolie and each member of the class above what was permitted by contract, Defendants unlawfully exercised dominion and control over their property in exclusion or defiance of their rights.

107. Plaintiffs and each member of the class were damaged by Defendants' conduct.

108. Defendants' conduct was malicious, willful, wanton, fraudulent, and in bad faith.

109. Defendants are each directly liable for conversion, are liable for aiding and abetting and participating in conversion, and are liable as members of a joint enterprise that converted money from customers.

110. Defendants are liable for actual and punitive damages.

### Fourth Claim for Relief: Willful Breach of Contract

111. Plaintiffs and all members of the class entered into contracts with Defendants, as provided above.

112. Defendants breached the contracts by collecting amounts not permitted by contract.

113. Plaintiffs and each member of the class were damaged by Defendants' conduct.

114. Defendants' breach of contract was malicious, willful, wanton, fraudulent, and in bad faith.

115. Defendants are each directly liable for breach of contract, are liable for aiding and abetting and participating in breaches of contract, and are liable as members of a joint enterprise that systematically breached contracts to collect illegal fees.

116. Defendants are liable for actual and punitive damages.

### Fifth Claim for Relief: Unjust Enrichment

117. Defendants knowingly benefitted at the expense of Plaintiffs and all other class members.

118. Allowing Defendants to retain the benefit would be unjust.

119. Defendants should be ordered to disgorge all benefits resulting from their misconduct.

### Sixth Claim for Relief: Civil Conspiracy

120. A conspiracy existed between the Defendants.

121. The wrongful acts described herein were carried out pursuant to the conspiracy.

122. As a result, Plaintiffs suffered damages.

123. Each Defendant is liable for legal violations of the others, as set forth above.

### Prayer for Relief

WHEREFORE, Plaintiffs pray that this Court:

A. Certify this case as a class action and appoint counsel to represent the class;

B. Award actual, statutory, treble and punitive damages as provided herein;

C. Award injunctive relief as provided herein;

D. Award reasonable attorney fees and costs; and

E. Grant such further relief that is just and reasonable under the circumstances.

Respectfully submitted,

*/s/Nicholas Mattison*
Nicholas Mattison
Richard N. Feferman
Feferman, Warren & Mattison, Attorneys for Plaintiff
300 Central Ave., SW, Suite 2000 West
Albuquerque, New Mexico 87102
(505) 243-7773
(505) 243-6663 (fax)