IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

WILLIAM DEJOLIE and
SAMMIA DEJOLIE,
on their own behalf and
on behalf of all others similarly situated

      Plaintiffs,

v.                                       Case No. 1:17-cv-00733-KK-SCY

T&R MARKET, INC.,
TANCORDE FINANCE, INC.,
T&R PAWN, LLC, and
T&R TAX SERVICE, INC.,

      Defendants.

**PLAINTIFFS' UNOPPOSED MOTION
FOR FINAL APPROVAL OF SETTLEMENT AGREEMENT**

      Plaintiffs, through counsel, respectfully request that the Court grant final approval to the proposed settlement agreement. The settlement agreement provides substantial benefits to class members, and represents a very favorable resolution of this lawsuit. It is fair, reasonable, adequate, and worthy of final approval. Defendants do not oppose this motion.

**I.      Standards for Final Approval of Class Action Settlements**

      A district court considering a proposed class action settlement must determine whether the settlement is fair, reasonable, and adequate. *In re Integra Realty Res., Inc.*, 354 F.3d 1246, 1266 (10th Cir. 2004). The Tenth Circuit utilizes a four-factor test for assessing whether a proposed settlement is fair, reasonable, and adequate, which includes: (1) whether the proposed settlement was fairly and honestly negotiated; (2) whether serious questions of law and fact exist placing the ultimate outcome of the litigation in doubt; (3) whether the value of an immediate recovery

1

outweighs the mere possibility of future relief after protracted and expensive litigation; and (4) the judgment of the parties that the settlement is fair and reasonable. *Jones v. Nuclear Pharmacy, Inc.*, 741 F.2d 322 (10th Cir.1984).

Review and approval of a proposed class action settlement involves two stages: preliminary approval and final approval. Here, Plaintiffs previously sought preliminary approval. [Doc. 55] On August 15, 2018, the Court granted preliminary approval [Doc. 62], directing that notice be sent to class members and scheduling a final fairness hearing for December 10, 2018. The fairness hearing will determine whether final approval of the proposed settlement agreement should be granted, including consideration of any objections raised by class members. Fed. R. Civ. P. 23(e)(1); Manual for Complex Litigation, Fourth, §21.634. At the fairness hearing, the court also determines the amount of the attorney's fee and cost awards and the class representative service awards. Manual for Complex Litigation, Fourth, §21.726.

## II.    Factual and Procedural Background

This action was filed on July 13, 2017 [Doc. 1, amended at Doc. 33], asserting causes of actions for Defendants' alleged violations of the federal Truth in Lending Act, 15 U.S.C. §1601 *et seq*. ("TILA") and the New Mexico Unfair Practices Act, NMSA §57-12-1 *et seq*. ("UPA"), and for conversion, willful breach of contract, unjust enrichment, and civil conspiracy. In the complaint, Plaintiffs stated that they planned to seek certification to proceed as a class action.

Plaintiffs alleged that Defendants are interconnected businesses that make tax refund anticipation loans to people living on and around the Navajo Nation in northwest New Mexico. Refund anticipation loans are loans secured by and repaid directly from the proceeds of a consumer's tax refund from the Internal Revenue Service. Every tax year, Defendants offer two kinds of tax refund anticipation loans. First, Defendants offer what they call "holiday loans" to

customers in November and December, before tax season.  Because W-2s have not yet issued and a tax return cannot be submitted, Defendants estimate the expected refund in order to calculate the amount they are willing to loan.  Borrowers indicate that they intend to file all of their tax returns through T&R Tax Service, Inc.  Once W-2s issue, borrowers return and prepare their tax returns with Defendants.  Tax refunds are paid directly into bank accounts that are established in the borrowers' names, and from which the loans are repaid.  After the tax return is submitted, borrowers are eligible for what Defendants call "instant cash loans."  Instant cash loans are similar to holiday loans, except that credit is extended based on the refund claimed in the actual tax return, instead of an estimate of the expected refund.

Plaintiffs alleged that between November 1, 2014 and July 13, 2017, the date this lawsuit was filed, all of Defendants' holiday loans and instant cash loans understated the true finance charge and annual percentage rate ("APR").  This made the loans appear less expensive than they really were, and gave Defendants an unfair competitive advantage against other lenders.  Plaintiffs alleged that the understatement of the finance charge and APR was the result of four separate unlawful practices.  Plaintiffs were subject to each of these allegedly unlawful practices, and each putative class member was subject to at least one.

With respect to holiday loans, Plaintiffs alleged that Defendants: (1) improperly disclosed a $25 "document fee" as part of the amount financed rather than the finance charge, making the loans appear less expensive than they really were; and (2) in loans beginning in December of 2014, understated the APR in the loans, in some cases by more than 100%.  With respect to both holiday loans and instant cash loans, Plaintiffs alleged that Defendants (3) improperly charged customers a "credit check fee" that was not authorized by contract and was not disclosed as part of the finance charge.  Plaintiffs also claimed that Defendants (4) deceptively collected a "tax preparation fee"

that was greater than the fee agreed upon by the parties at the time the tax return was prepared. Plaintiffs sought certification of a class of persons affected by this practice.

Defendants denied that they violated the law, disputed Plaintiffs' allegations, and raised legal and factual defenses to Plaintiffs' claims. At the time of settlement, the parties were in discovery, with Defendants having responded to requests for admission, interrogatories, and requests for production.

### III.    Background of the Parties' Settlement

The parties attended a settlement conference led by this Court on May 11, 2018. After mediating for most of the day, the parties reached settlement.

Prior to resolving their claims, Plaintiffs conducted a thorough investigation. This investigation included pre-litigation research of the business practices of Defendants; extensive informal discussions with Defendants' counsel after the filing of this case; review of Defendants' Answers; review of documents disclosed as part of Defendants' initial disclosures; review of Defendants' written discovery responses; and participation in the settlement conference that eventually resolved this case. Among other things, through their investigation, Plaintiffs: (1) verified that all borrowers in holiday loans and instant cash loans during the applicable class period were subject to one of more of the practices alleged by Plaintiffs to have been unlawful; (2) determined that there were 14,948 putative class members (counting co-borrowers as a single class member); and (3) calculated that total potential damages of $1,957,839.29 that could be available to class members were Plaintiffs to be completely successful in their legal claims. The latter number was calculated by determining the total dollar value of the finance charge and APR discrepancies in all loans, including the total dollar amount of the misrepresented document fees

and credit check fees.[1]  Plaintiffs also received specific financial information about Defendants, including balance sheets and income statements, to permit them to evaluate Defendants' ability to pay a judgment or settlement.

In reaching settlement, Plaintiffs weighed the risks and benefits of continued litigation, including the inherent uncertainty of proceeding, defenses presented by Defendants, the likelihood of substantial expense and delay if settlement could not be reached, and the financial limitations on Defendants' ability to pay damages.  Regardless of Plaintiffs' confidence in their claims, litigation is not certain, and Defendants stated a number of factual and legal defenses.  These defenses included allegations that not all Defendants were liable for the alleged wrongdoing; that certain fees were not Finance Charges and as such were not improperly disclosed; that standards for liability pursuant to the UPA and other claims differed from the TILA and could be more difficult to prove; that Defendants' violations were not willful and were instead the result of good faith errors; and that differing circumstances could pose a challenge for class certification.  Given the complexity of this case, it likely would have required a large number of depositions and extensive written discovery throughout the class certification process up through trial of the matter. Counsel may have been required to retain costly consultants and expert witnesses to offer opinions regarding liability and damages, and to rebut the opinions of Defendants' experts.  The costs of litigation would have been considerable relative to likely recovery.  Even in the event of success, costly and time-consuming appeals were likely.  Defendants' financial records demonstrated that payment was doubtful in the event of a large judgment following years of litigation.

---

[1] Plaintiffs chose not to include the discrepancy in the tax preparation fees in this calculation.  Plaintiffs' investigation revealed this discrepancy to be the result of gross receipts tax, and Plaintiffs evaluated that this claim faced significant difficulties going forward.

In light of these considerations, and particularly because the parties were able to reach a settlement agreement that was highly favorable to class members, Plaintiffs believe that the proposed settlement agreement is in the best interests of the class.

## IV.    Preliminary Approval of the Settlement Agreement

On July 30. 2018, Plaintiffs moved for preliminary approval of the settlement agreement. [Doc. 55]  The Court granted the motion.  [Doc. 62]  In its Order, the Court certified a class consisting of "All persons who entered into Holiday Loans or Instant Cash Loans or both or who otherwise were charged any Credit Check Fees with any of the Defendants between November 1, 2014 and July 13, 2017."  *Id*.  The Court appointed Plaintiffs as class representatives and Plaintiffs' counsel as class counsel.  *Id*.  The Court found the settlement agreement worthy of preliminary approval, and directed that notice be sent to class members.  *Id*.  The Court scheduled a final approval hearing for December 10, 2018.

## V.    Class Members Were Properly Notified

Using claims administrator American Legal Claims Services, Plaintiff sent Court-approved notice to class members as ordered.  *See* Exhibit 1 (Declaration of American Legal Claims Services).  The vast majority of class members were located, yielding a notification rate of 96.17%.  *Id*.  Of the more than 14,000 class members, only three excluded themselves from the settlement. [Docs. 64-66]  Only one person objected.  [Doc. 63]  The objection is discussed in greater detail below.

## VI.    The Parties Complied With the Class Action Fairness Act

On August 1, 2018, Defendants submitted notice of the Settlement Agreement to the appropriate federal and state Attorneys General in compliance with the Class Action Fairness Act, 28 U.S.C. § 1715 ("CAFA").  [Doc. 56]  No response has been received, and because 90

days will have elapsed since the mailing of the notice, pursuant to the CAFA, the Court may enter final judgment following the hearing on December 10, 2018.

## VII.    Summary of the Settlement Terms and Proposed Distribution

The proposed settlement agreement and plan of distribution provides substantial benefits to class members, and is worthy of final approval.

### A.    Cash Payments to Class Members

The settlement agreement calls for the payment of $950,000 by Defendants. This represents just under 50% of the estimated total potential damages if Plaintiffs were completely successful in their claims, as calculated above. After payment of attorney's fees, tax, costs, costs of administration, and a service award for the named Plaintiffs, discussed below, Plaintiffs estimate that $720,000, or 76% of the total settlement fund, will be available for distribution to class members.

Plaintiffs propose a straightforward plan of allocation of the settlement fund. Since the portion of the settlement fund available for distribution constitutes 37% of the total potential damages in the case, each class member will receive 37% of his or her individual total potential damages. In other words, Plaintiffs will calculate the exact value of each class member's individual total potential damages, consisting of the total dollar value of the finance charge and APR discrepancies in the class member's loans, including the total dollar amount of the misrepresented document fees and credit check fees. Plaintiffs will then calculate and distribute a *pro rata* share of individual total potential damages. The average payment is estimated at $48, although payments will vary because class members with greater damages will receive greater compensation.

As an additional benefit, Defendants have agreed to cash settlement checks presented at

Gallup locations at no charge.

### B.    No Action Required By Class Members to Participate in Settlement

The settlement agreement does not require class members to submit claim forms or to take any affirmative steps to receive the benefits of the settlement. This process ensures maximum benefits to the class members.

### C.    Right to Opt Out or Object

Plaintiffs' notice explained class members' right to opt out of this case entirely, or in the alternative to object to the proposed settlement agreement. The deadline to opt out or object was November 2, 2018.

### D.    Award of Attorney's Fees

Plaintiffs request that the Court grant preliminary approval to an award of attorney's fees from the common fund in the amount of $190,000, or 20% of the common fund. This amount is inclusive of gross receipts tax.

"When there is a common fund created by a settlement, courts have applied one of two methods of determining reasonable attorney's fee awards: by a percentage of the fund, or by the lodestar method developed in the statutory fee shifting cases." *Rosenbaum v. MacAllister*, 64 F.3d 1439, 1445 (10th Cir. 1995). The Tenth Circuit has stated a "preference for the percentage of the fund method." *Gottlieb v. Barry*, 43 F.3d 474, 483 (10th Cir. 1994). This method involves "a sharing of the fees among those benefitted by the litigation," and "aligns the interests of class counsel with the interests of the class." *Ramah Navajo Chapter v. Jewell*, No. 90 CV 957 JAP/KBM, 2016 WL 825710, at *18-19 (D.N.M. Mar. 2, 2016) (internal quotation marks and citation omitted). To determine the reasonableness of a percentage of the fund request, "federal courts have relied heavily on the factors articulated by the Fifth Circuit in *Johnson v. Georgia*

*Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974)." *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454 (10th Cir. 1988). The *Johnson* factors are:

> (1) the time and labor involved; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) any prearranged fee—this is helpful but not determinative; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Jewell*, 2016 WL 825710, at *18 (quoting *Johnson*, 488 F.2d at 717-19). Here, the *Johnson* factors weigh strongly in favor of the requested award.

### (1) The Time and Labor Involved and (11) the Nature and Length of the Professional Relationship

This case was filed more than a year ago. Since its inception, the case has involved considerable labor, starting with pre-filing investigation, through active litigation, and most recently in a long informal and formal settlement process. *See* Exhibit 2 (Declaration of Nicholas Mattison). Class counsel was involved with this case since its inception, and demonstrated "devotion to the best interest of class members during the span of [this] professional relationship[]." *Millsap v. McDonnell Douglas Corp.*, No. 94-CV-633-H(M), 2003 WL 21277124, at *11 (N.D. Okla. May 28, 2003). The complete resolution of this contested class action in little more than a year represents expeditious and diligent work on the part of class counsel.

### (2) The Novelty and Difficulty of the Questions

This case involved novel and difficult questions, and presented complex challenges in proceeding through certification to the merits. Defendants' liability turned on technical application

of the TILA and the UPA.  The application of these laws to more than ten thousand class members

rendered the case all the more difficult.  From its outset, this case covered new ground.

### (3) The Skill Required and (9) the Experience, Reputation, and Ability of the Attorneys

Because this case presented novel and difficult questions, it required a high degree of skill

to litigate.   Plaintiffs were represented by New Mexico's preeminent consumer law firm.

Feferman, Warren & Mattison has practiced exclusively in consumer law in New Mexico for more

than twenty years.  *See* Exhibit 2 (Declaration of Nicholas Mattison).  Several years ago, the firm

was appointed class counsel in another consumer class action, *Chester v. Tancorde Finance, Inc.*,

1:14-CV-92 JAP/KK (Doc. 33, January 12, 2015), in which the District of New Mexico stated

"Mr. Feferman has been a mainstay in successful consumer class actions in this District, and the

Court is confident he will adequately represent the class and vigorously prosecute this case to its

conclusion."  Even more recently, approving a class action settlement agreement, the Court opined

that "Mr. Feferman and Mr. Mattison are highly capable practitioners of consumer law in New

Mexico." *Tullie v. T&R Market, Inc.*, 1:14-CV-670 KBM/GJF (Doc. 147, August 30, 2016).  State

courts agree, with New Mexico's Eleventh Judicial District observing earlier this year that "Class

Counsel Nicholas Mattison demonstrated his experience and ability in successfully litigating this class

action to an exceptional resolution for the class.  Mr. Mattison has a reputation as a skilled practitioner

of consumer law."  *Peina v. Carma Enterprises, Inc.*, No. D-1113-CV-2014-00158 (March 1,

2018).

Plaintiffs' counsel demonstrated a high degree of skill in preparing, litigating, and very

favorably settling this case.

<u>(5) The Customary Fee and (12) Awards in Similar Cases</u>

Some Courts in the Tenth Circuit have indicated that there is a "25% benchmark" for percentage of the fund attorney's fee awards, with adjustments to be made based on the *Johnson* factors. *Ramah Navajo Chapter v. Norton*, 250 F. Supp. 2d 1303, 1316 (D.N.M. 2002). However, this "benchmark" is not universally cited, and awards above 25% are quite common. "[F]ees in the range of 30–40% of any amount recovered are common in complex and other cases taken on a contingent fee basis." *Lane v. Page*, 862 F. Supp. 2d 1182, 1256 (D.N.M. 2012) (Browning, J.); *see also*, *Chieftain Royalty Co. v. SM Energy Co.*, No. CIV-11-177-D, 2015 WL 9451069, at *4 (W.D. Okla. Dec. 23, 2015) ("fees in the range of one-third of the common fund are frequently awarded in class action cases as fair and reasonable."); *Anderson v. Merit Energy Co.*, No. CIV. 07-CV-00916 LTB/BNB, 2009 WL 3378526, at *3 (D. Colo. Oct. 20, 2009) ("The customary fee to class counsel in a common fund settlement is approximately one-third of the economic benefit bestowed on the class.").

Plaintiffs' attorney's fee request is modest under the standards established in the Tenth Circuit. As noted above, the requested award of $190,000 for attorney's fees represents 20% of the total settlement fund. These percentages are well within the normal range in the Tenth Circuit.

<u>(6) Any Prearranged Fee and (4) The Preclusion of Other Employment</u>

Class counsel undertook this action on a contingency basis. *See* Exhibit 2 (Declaration of Nicholas Mattison). Class counsel would receive no compensation for their work if they did not prevail in this action. "Given the risk of non-recovery, this factor weighs heavily in favor of the requested fee." *Vaszlavik v. Storage Corp.*, No. 95-B-2525, 2000 WL 1268824, at *4 (D. Colo. Mar. 9, 2000). "Such a large investment of money and time places incredible burdens upon law practices and should be appropriately considered." *Lane,* 862 F. Supp. 2d at 1256 (D.N.M. 2012)

(internal quotation marks, citation, brackets, and ellipsis omitted); *see also, Been v. O.K. Indus., Inc.,* No. CIV–02–285 RAW, 2011 WL 4478766, at *9 (E.D.Okla. Aug. 16, 2011) ("Courts agree that a larger fee is appropriate in contingent matters where payment depends on the attorney's success.").

In addition to taking the risk of non-payment, Plaintiffs' counsel were precluded from engaging in other work during the time dedicated to this case. This type of action "necessarily require[s] a great deal of work, and a concomitant inability to take on other cases." *Lucas v. Kmart Corp.*, No. CIV.A. 99-01923, 2006 WL 2729260, at *6 (D. Colo. July 27, 2006).

<u>(10) The Undesirability of the Case</u>

This case was difficult and risky. No law firm other than Class Counsel showed any willingness to undertake this litigation. *See* Exhibit 2 (Declaration of Nicholas Mattison). *Cf. Lane,* 862 F. Supp. 2d at 1258 (D.N.M. 2012) ("at the class certification stage, no other class member or law firm sought to represent the class."). No class member other than Mr. and Mrs. DeJolie was willing make the considerable investment of time and resources to represent the classes. "Attorneys must have incentive to take undesirable cases in order to assure access to the courts for all people; awarding fees based on a reasonable percentage of the recovered fund provides such an incentive." *Millsap,* 2003 WL 21277124, at *12.

<u>(8) The Amount Involved and Results Obtained</u>

The settlement agreement involves the creation of a settlement fund worth nearly one million dollars. This is a very substantial recovery for consumers, particularly considering that the defendant is a small lender in Gallup, New Mexico. Moreover, on an individual basis, the settlement agreement means real money for class members. Members of the class will receive an average of $48 each, with some receiving more than $100.

Class counsel respectfully submit that they have achieved an outstanding result for class members.

### E.    Award of Costs

In addition to attorney's fees, Plaintiffs also request that the Court award costs in the amount of $35,000 from the common fund.  Plaintiffs request taxable costs as are usually awarded to a prevailing party in any litigation pursuant to Fed. R. Civ. P. 54(d)(1) and 28 U.S.C. § 1920.[2] In addition, as authorized by the fee-shifting statutes applicable here, 15 U.S.C. § 1640(a)(3) and 15 U.S.C. § 1693m(a)(3), and NMSA § 57-12-10(C), Plaintiffs request an award of costs for which a client would ordinarily be billed and that are not part of counsel's overhead.  *See, e.g.*, *Payton v. New Century Mortgage Corp.*, 2004 WL 524693 (N.D. Ill. Mar. 11, 2004) (TILA case); *Daenzer v. Wayland Ford Inc.*, 2003 WL 22414966 (W.D. Mich. Sept. 25, 2003) (TILA case).  These include the cost of notice to the class and the anticipated cost of class administration.  Plaintiffs' currently known costs are estimated at $34,279.22.  *See* Exhibit 2 (Declaration of Nicholas Mattison); Exhibit 3 (statement of costs); Exhibit 4 (class administration estimate).  Plaintiffs round to $35,000 to cover unanticipated costs.  Plaintiffs will endeavor to redistribute any unused costs to class members, and in no event will any unspent funds allocated to costs be paid to class counsel.

---

[2] 28 U.S.C. § 1920 provides that "A judge or clerk of any court of the United States may tax as costs the following:
(1) Fees of the clerk and marshal;
(2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
(3) Fees and disbursements for printing and witnesses;
(4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
(5) Docket fees under section 1923 of this title;
(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title."

13

### F.    Service Award to Mr. and Mrs. DeJolie

Plaintiffs request that the Court grant preliminary approval to a service award of $5,000, or $2,500 each, for the named Plaintiffs, William and Sammie DeJolie.  "[C]ourts regularly give incentive awards to compensate named plaintiffs for the work they performed—their time and effort invested in the case." *Chieftain Royalty Co. v. Enervest Energy Institutional Fund XIII-A, L.P.*, 861 F.3d 1182, 1195 (10th Cir. 2017).  "The practice of granting incentive awards to Class Representatives is common and widespread in class litigation." *Ponca Tribe of Indians of Oklahoma v. Cont'l Carbon Co.*, No. 05-445 (C), 2009 WL 2836508, at *2 (W.D. Okla. July 30, 2009) (approving awards ranging from $1,000 to $15,000 for class representatives).  "[I]ncentive awards are an efficient and productive way to encourage members of a class to become class representatives, and to reward the efforts they make on behalf of the class." *Shaw v. Interthinx, Inc.*, No. 13-CV-01229-REB-NYW, 2015 WL 1867861, at *8 (D. Colo. Apr. 22, 2015) (internal quotation marks and citation omitted) (awarding $10,000 to each of five named plaintiffs); *see also*, *Jones v. I.Q. Data Int'l, Inc.*, No. 1:14-CV-00130-PJK, 2015 WL 5704016, at *2 (D.N.M. Sept. 23, 2015) (approving an incentive award of $20,000 out of a $1,000,000 settlement fund). Incentive awards are justified "when a class representative is not forthcoming," and may be justified "when the class representative undertakes risk, provides additional effort, or contributes expertise to prosecuting a class action." *Lane*, 862 F.Supp.2d at 1236 (Browning, J.) (citing *UFCW Local 880–Retail Food Employers Joint Pension Fund v. Newmont Mining Corp.,* 352 Fed.Appx. 232 (10th Cir.2009)).

Here, no other person indicated any willingness or interest in serving as class representative. *See* Exhibit 2 (Declaration of Nicholas Mattison).  Without Mr. and Mrs. DeJolie's efforts, there would be recovery whatsoever for the class.  Mr. and Mrs. DeJolie served as

exemplary class representatives, working with their attorneys on case strategy, litigation, and settlement decisions. *Id.* With no assurance of any compensation for their efforts, Mr. and Mrs. DeJolie persevered through hardship to pursue the interests of the class. *Id.* Living on the Navajo Nation and supporting a young family, serving in this role was not easy for Mr. and Mrs. DeJolie. *Id.* In addition to incurring expenses and spending a large amount of time, Mr. and Mrs. DeJolie took risks to serve as class representatives. The publicity associated with this class action, which almost immediately drew media attention, placed their reputations at risk. *Id.*

Mr. and Mrs. DeJolie have been closely involved in this case for more than a year. *Id.* Their efforts were much greater than the effort required "if . . . [their] action were an individual action." *Robles v. Brake Masters Sys., Inc.*, No. CIV 10-0135 JB/WPL, 2011 WL 9717448, at *13 (D.N.M. Jan. 31, 2011) (Browning, J.). Mr. and Mrs. DeJolie met with their attorneys in person in Albuquerque on 3 occasions, including a settlement conference, for a total of more than 12 hours. *See* Exhibit 2 (Declaration of Nicholas Mattison). They expect to make an additional trip to Albuquerque for the fairness hearing. *Id.* Mr. and Mrs. DeJolie incurred various out-of-pocket expenses relating to their travel. *Id.* Every trip to Albuquerque required Mr. and Mrs. DeJolie to make a round trip of approximately 260 miles. *Id.* In addition to these in-person meetings, Mr. and Mrs. DeJolie were in constant contact with counsel. Mr. and Mrs. DeJolie conferred with counsel by phone on more than 20 occasions. *Id.* Mr. and Mrs. DeJolie reviewed pleadings and other documents in great detail. *Id.*

Mr. and Mrs. DeJolie's labors have produced a substantial judgment that would have been impossible without them. A service award of $5,000 is reasonable to compensate Mr. and Mrs. DeJolie for their contributions to this case.

### G.   *Cy Pres* Award

Plaintiffs propose to distribute any portions of the settlement fund that cannot be practicably and economically distributed to class members to the following *cy pres* recipients in equal shares: Equal Access to Justice, Inc., and Battered Family Services, Inc. "The cy pres doctrine allows a court to distribute unclaimed or non-distributable portions of a class action settlement fund to the 'next best' class of beneficiaries." *Tennille v. W. Union Co.*, 809 F.3d 555, 560 n.2 (10th Cir. 2015) (internal quotation marks and citation omitted). Plaintiffs will attempt to redistribute any unclaimed funds to class members prior to making the cy pres donation, including through multiple rounds of check distributions, if necessary. Equal Access to Justice, Inc., is a 501(c)(3) nonprofit organization that raises and distributes funds to New Mexico legal aid organizations. Battered Family Services, Inc., is also a 501(c)(3) nonprofit organization. It provides comprehensive services to victims of domestic violence. These organizations provide services in the northwest part of the state where most class members reside.

## VIII.  The Single Objection Received Does Not Weigh Against Approval

As noted above, only a single class member, Barney L. Willie, filed an objection to the settlement agreement. [Doc. 63] However, Mr. Willie's objection stated only that "I, Barney L. Willie objecting to the settlement." *Id*. This objection fails to comply with the Court's requirements, stated in its Order Granting Preliminary Approval [Doc. 62] and in the notice sent to class members:

> Any objection must include (a) your full name, address, and daytime telephone number; (b) an identification of this case by name and case number (shown at the top of this notice); (c) if you plan to appear through counsel, counsel's name, address and phone number; (d) a detailed statement of the specific legal and factual bases for each and every objection, and, if through counsel, a legal memorandum in support of the objection; (e) a list of any witnesses, along with the expected testimony of each such witness, and photocopies of exhibits which the objector intends to introduce at the final approval hearing; and (f) your signature.

These requirements were designed to assure that Plaintiffs and the Court had fair notice of the any objector's position, and sufficient information to evaluate it. It is true that "[o]bjectors can play a useful role in the court's evaluation of the proposed settlement terms." Manual for Complex Litigation, Fourth, §21.643. However, Mr. Willie's objection is completely inadequate, and should not carry any weight with the Court.

## IX.    Final Approval of the Settlement Agreement Is Appropriate

For all of the reasons set forth herein, the proposed settlement agreement is fair, reasonable, and adequate, and is worthy of final approval. The agreement provides substantial benefits to class members. It was the product of serious, informed, non-collusive negotiations. The agreement has no obvious deficiencies. It does not improperly grant preferential treatment to class representatives or segments of the class. Although the parties agree to a modest compromise of the claims of class members, this compromise is the result of careful consideration. Plaintiffs believe that given the risks and uncertainties of litigation, the probability of extensive delays through appeal in achieving final resolution through litigation, the defenses which the Defendants have asserted in this case, and the uncertainty of collecting any judgment from Defendant, this settlement is fair, and adequate, and is in the best interests of the Class.

## X.    Conclusion and Relief Requested

Plaintiffs respectfully request that the Court grant final approval to the parties' settlement agreement.


Respectfully submitted,

*/s/Nicholas Mattison*
Nicholas Mattison
Feferman, Warren & Mattison, Attorneys for Plaintiffs

17

300 Central Ave., SW, Suite 2000 West
Albuquerque, NM 87102
(505) 243-7773
(505) 243-6663 (fax)

Approved:

*Approved via email*
Thomas Lynn Isaacson
Mason & Isaacson, P.A.
P.O. Box 1772
Gallup, NM 87305
(505)722-4463
Counsel for Defendant Tancorde Finance, Inc.

*Approved via email*
Charles J. Vigil
Rodey, Dickason, Sloan, Akin & Robb, P.A.
P.O. Box 1888
Albuquerque, NM 87103
(505)765-5900
Counsel for Defendant T&R Tax Service, Inc.

*Approved via email*
James J. Widland
Miller Stratvert P.A.
P.O. Box 25687
Albuquerque, NM 87125
(505)842-1950
Counsel for Defendants T&R Market, Inc. and T&R Pawn, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on November 16, 2018, I filed the foregoing pleading electronically through the Court's CM/ECF File System, which caused all parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

*/s/ Nicholas Mattison*